UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TAMIR TAUHEED BELL,

                Petitioner,

v.                                     CASE NO. 11-10328
                                     HONORABLE LAWRENCE P. ZATKOFF

DAVID BERGH,

                Respondent.
_____/

## OPINION AND ORDER
## DENYING THE PETITION FOR WRIT OF HABEAS CORPUS
## AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

This matter is pending before the Court on petitioner Tamir Tauheed Bell's habeas corpus petition under 28 U.S.C. § 2254 [dkt 1]. The habeas petition challenges Petitioner's state convictions for three drug offenses and two firearm offenses. Petitioner claims that the prosecutor committed misconduct, the testimony of unqualified individuals deprived him of a fair trial, there was insufficient evidence to support his firearm convictions, and his trial attorney was ineffective. The Court agrees with respondent David Bergh, who filed an answer through counsel, that Petitioner's claims are either procedurally defaulted or they lack merit and do not warrant habeas relief. Consequently, the habeas petition must be denied.

## I. BACKGROUND

### A. The Charges, Trial, and Sentence

Petitioner was charged in Oakland County, Michigan with: conspiracy to possess with intent to deliver between 50 and 225 grams of cocaine, Mich. Comp. Laws § 333.7401(2)(a)(iii), Mich. Comp. Laws § 750.157a; possession with intent to deliver between 50 and 225 grams of cocaine,

Mich. Comp. Laws § 333.7401(2)(a)(iii); delivery of less than 50 grams of cocaine, Mich. Comp. Laws § 333.7401(2)(a)(iv); and two counts of possession of a firearm during the commission of a felony, Mich. Comp. Laws § 750.227b. The charges arose from allegations that Petitioner sold cocaine to a police informant during a controlled buy in Detroit on September 26, 2002. Although a warrant was issued for Petitioner's arrest, he eluded the police and was not arrested until February 27, 2007. In September of 2007, Petitioner was tried before a jury in Oakland County Circuit Court.

Officer Richard Wehby of the Farmington Hills Police Department testified at trial that he conducted an investigation which resulted in Shannon Portis' arrest on a drug charge in September of 2002. Portis accepted Officer Wehby's offer to work as an informant and then named someone from whom he could purchase cocaine. Officer Wehby arranged a controlled buy, which he explained is a closely monitored operation involving an informant who purchases narcotics from a suspect with prerecorded funds from the police department.

On September 26, 2002, Portis placed a phone call to Petitioner while seated in Officer Wehby's vehicle. Officer Wehby directed Portis to ask Petitioner for an ounce and a half of cocaine. The reason for requesting this amount was to determine whether Petitioner was capable of supplying that much cocaine. Petitioner informed Portis that he had only an ounce of cocaine at his residence and that he would have to pick up the rest of it.

Officer Wehby had been advised that Petitioner lived on Clarita Street, and, after providing Portis with $220 in prerecorded police money, he followed Portis to 23510 Clarita Street in Detroit. Petitioner entered Portis' vehicle at the house on Clarita. Wehby then followed Portis' vehicle to an address on Appoline Street in Detroit. He saw Petitioner exit the vehicle and walk toward the

2

residence at 19965 Appoline Street where a Chevrolet Impala registered to Rory Jones was parked.[1]

At some point after Petitioner left Portis, Portis called Detective Wehby on the phone and stated that he thought Petitioner misunderstood how much cocaine he wanted. Wehby then instructed Portis to tell Petitioner that he had only enough money to buy an eight ball of crack cocaine and an eight ball of powder cocaine.

Wehby later observed Petitioner walk from the house on Appoline Street towards Portis' vehicle. After Petitioner got in the vehicle, he and Portis proceeded to a Sunoco gas station. They subsequently returned to the Appoline address where Petitioner once again exited the vehicle and walked toward the house at 19965 Appoline Street. About five minutes later, Petitioner re-entered Portis' vehicle, and the vehicle returned to the house on Clarita Street. Petitioner got out of Portis' vehicle and walked toward a detached garage behind the house. Officer Wehby next saw Petitioner as he walked from the garage to the driver's side of Portis' vehicle.

Officer Wehby subsequently met Portis at a pre-arranged meeting place where Portis turned over the narcotics that he had purchased from Petitioner. The crack cocaine was in a knotted plastic bag, and the powder cocaine was contained in a separate plastic bag. One bag weighed 4.43 grams, and the other bag weighed 4.34 grams.

Officer Wehby participated in subsequent searches of the houses on Clarita and Appoline Streets. At the house on Appoline Street he observed a pregnant teenager, an infant, two teenage boys, and Tracey Cowan, who appeared to be about forty years old. Correspondence in the house was addressed to Ms. Cowan. Officer Wehby searched the master bedroom where he observed a

---

[1] Although Mr. Jones' first name is spelled Rorry in the transcript of trial, the Court has adopted the spelling used by the Michigan Court of Appeals.

loaded shotgun leaning against the wall. In the bedroom closet was a paper bag, which contained a one-gallon "baggie" of cocaine. A duffle bag in the closet contained a loaded handgun and a "baggie" with a larger quantity of cocaine. The larger bag of cocaine weighed 579.5 grams, and the smaller bag contained 134.5 grams of cocaine. Officer Wehby also found marijuana, a digital scale, and packaging materials in the bedroom.

The house on Clarita Street was occupied by an older man and woman who claimed to be the homeowners. In the basement of the house, Officer Wehby found some 40-caliber ammunition, packaging material, a police identification card for Terrell Bell, and a military identification card for Terrell. After execution of the two search warrants, Detective Wehby attempted to locate Petitioner, but he was unsuccessful.

Detective Eric Gruenwald of the West Bloomfield Police Department and Sergeant Kevin Cronin of the Farmington Hills Police Department assisted Officer Wehby in the roving surveillance of Shannon Portis on September 26, 2002. Detective Gruenwald saw Petitioner enter and exit the house on Appoline Street and subsequently enter and exit the detached garage on Clarita Street and then approach the informant's vehicle.

Sergeant Cronin learned from Shannon Portis that Petitioner stored his cocaine at his grandmother's house on Clarita Street in Detroit. During the execution of a search warrant at the property on Clarita Street, Sergeant Cronin located a twelve-gauge shotgun in the garage behind the house. In Sergeant Cronin's opinion, the amount of cocaine that another officer found at the Clarita address was consistent with intent to distribute the cocaine, because the quantity was more than one person could consume.

Cronin also participated in the execution of the search warrant at the house on Appoline

4

Street.  In a storage area off the northwest bedroom, he found three triple-beam scales with marijuana residue on them.  In the basement of the house, he found an empty cellophane wrapper for a kilo of cocaine.  Tracey Cowan's fingerprint was identified on a cellophane wrapper found in her bedroom at the Appoline Street address.  No other identifiable fingerprints were found on items that were submitted to the lab for analysis.

After the raids, Sergeant Cronin subpoenaed Petitioner's telephone records and determined that Petitioner attempted to call Rory Jones three times on September 26, 2002.  The first two calls were at 5:27 and 5:28 p.m., and the third call was at 6:04 p.m.  Mr. Jones was the target of a federal drug investigation at the time.

Informant Shannon Portis testified at trial that his memory of the case was foggy, but that he testified truthfully at prior court proceedings on October 23, 2002, and in July of 2003.  The prosecutor was then permitted to read the transcript of Portis' testimony from the court proceeding on October 23, 2002.  During that proceeding, Portis corroborated much of Officer Wehby's testimony at Petitioner's trial about the sequence of events on September 26, 2002.  Portis explained how he had been arrested and had cooperated with the police by purchasing cocaine from Petitioner. During his live testimony at Petitioner's trial, Portis stated that Petitioner stored his drugs at his grandmother's house and that, on September 26, 2002, Petitioner walked toward the garage behind the house on Clarita Street and later handed him hard and soft cocaine in return for $220.00.

Sergeant Paul Nicholas of the Farmington Hills Police Department testified that he participated in the execution of the search warrant at 23510 Clarita Street on September 27, 2002. He searched the detached garage and found two shoe boxes in the rafters directly above the garage door.  One shoe box contained 80 grams of crack cocaine, 16 grams of powder cocaine, a box of

5

sandwich "baggies," and a digital scale. The other shoe box contained a loaded nine-millimeter handgun, some ammunition, and two prescription pill bottles. Terrell Bell's name was on the prescription bottles, which were dated July 24, 2002. The cocaine was wrapped in individual packages estimated at an eight-ball weight, which is three and a half grams or an eighth of an ounce of cocaine.

Retired Oakland County deputy sheriff David Emory Scott testified that he assisted in executing the search warrant at the house on Appoline Street. In the laundry area of the house, he located a kilo of cocaine packaged in eight individual blocks. He also found a hydraulic jack, which he claimed was used as a cocaine press, a digital scale, multiple boxes of baking soda, which he said is a dilutant, and bags for packaging narcotics.

Bastida Lennette Ballard testified that she was a dental assistant and that in July of 2002, Petitioner used his brother Terrell's insurance card to obtain treatment for a toothache. He was given four prescriptions.

Petitioner's brother Terrell Bell[2] testified that, in July of 2002, he was employed as a police officer for the Detroit Police Department. That same month, he loaned Petitioner his driver's license and insurance card so that Petitioner could be treated by a dentist. He (Terrell) was arrested on September 26, 2002, and pleaded guilty to two counts of insurance fraud for giving Petitioner his identification. He did not go to the dentist in July of 2002, and he did not receive four prescriptions. Although initially he was charged with a drug offense for the raid on his grandparents' house, he was not convicted of any drug charges, and neither he, nor his brother, lived at their grandparents'

---

[2] Terrell is also spelled "Terrel" in the transcript of trial. The Court has adopted the spelling used by the Michigan Court of Appeals.

house at the time. He "probably" informed an officer that his brother sold drugs, but he never saw Petitioner selling drugs.

Oakland County Deputy Sheriff Brent Miles testified that he spoke with Terrell Bell the day after execution of the search warrant at 23510 Clarita Street. During that conversation, he asked Terrell whether his brother was the one selling the narcotics. Terrell answered, "Yes."

Fred Solano testified that he was Petitioner's grandfather and that Petitioner lived with him on Clarita Street until he was in the twelveth grade when he went to live with his brother Terrell. On September 26, 2002, which was the night of the raid on the house, only Mr. Solano and his wife Willie lived in the house. Mr. Solano admitted that the garage was never locked and that nothing would have prevented Petitioner from going in the garage. He also claimed that he did not discuss the drug raid with Petitioner.

Mrs. Willie Bell testified that she was Petitioner's grandmother and that Petitioner and his siblings lived with her until they graduated from high school. On September 26, 2002, only she, her husband, and her oldest son lived in the house on Clarita Street. The garage to the house did not have a key and was never locked. Before the raid on her house, Petitioner would visit her "now and then," but after the raid, she did not see him for three years. Former deputy sheriff David Emery Scott testified that, during execution of the search warrant on Fred Solano's and Willie Bell's home, the couple informed him that Petitioner was a frequent visitor to their home and that he virtually lived in the basement of the house, although he stayed elsewhere as well.

Petitioner did not testify or present any witnesses, and on September 28, 2007, the jury found him guilty, as charged, of conspiracy to possess with intent to deliver between 50 and 225 grams of cocaine, possession with intent to deliver between 50 and 225 grams of cocaine, delivery of less than

50 grams of cocaine, and two counts of possession of a firearm during the commission of a felony (felony firearm). The trial court sentenced Petitioner to imprisonment for consecutive terms of ten to twenty years for the conspiracy conviction, ten to twenty years for the possession conviction, two to twenty years for the delivery conviction, and two years for the felony firearm convictions. The sentences for the two felony firearm convictions ran concurrently with each other.

## B.  The Appeal

Petitioner exhausted state remedies for his habeas claims by raising them in an appeal of right. At his request, the Michigan Court of Appeals remanded his case to the trial court for an evidentiary hearing on whether he was denied effective assistance of counsel. On remand, Petitioner moved for a new trial. The trial court held an evidentiary hearing on Petitioner's motion and then denied it. Following the remand, the Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See People v. Bell*, No. 282222, 2009 WL 1027462 (Mich. Ct. App. Apr. 16, 2009). On October 26, 2009, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues. *See People v. Bell*, 773 N.W.2d 686 (Mich. 2009) (table).

## C.  The Habeas Proceedings

Petitioner filed his habeas corpus petition through counsel on January 26, 2011. He claimed that:

1.  he was denied a fair trial by several instances of prosecutorial misconduct, including: A) use of co-conspirators' convictions as substantive evidence; B) use of impeachment evidence as substantive evidence; and C) impermissible vouching for prosecution witnesses;

2.  the testimony by unqualified persons, without a sufficient showing of reliability of the evaluation techniques, denied him a fair trial;

8

3.    the evidence was insufficient to support the verdict of possession of a firearm in the course of a felony; and

4.    he was denied a fair trial by ineffective assistance of counsel in violation of the Sixth Amendment.

Respondent moved for summary judgment and dismissal of the habeas petition on the ground that Petitioner did not comply with the one-year statute of limitations for habeas petitions. The Court denied Respondent's motion after concluding that the habeas petition was timely because the limitations period was equitably tolled for the time that Petitioner's attorney was experiencing medical problems. Respondent then filed an answer to the habeas petition in which he continues to maintain that the petition should be dismissed as untimely. Respondent also asserts that Petitioner's first and second claims are procedurally defaulted and, if the Court excuses the procedural default, it should deny relief because all of Petitioner's claims lack merit. Petitioner replies that his claims have merit and are not procedurally defaulted.

## II.  STANDARD OF REVIEW

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)." *Harrington v. Richter*, __ U.S. __, __, 131 S. Ct. 770, 783 (2011). Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

9

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000) (O'Connor, J., opinion of the Court for Part II). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) ( per curiam )." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87.

### III. ANALYSIS

10

## A.  The Procedurally Defaulted Claims

In his first claim, Petitioner alleges that the prosecutor deprived him of a fair trial by (1) using the convictions of two alleged co-conspirators as substantive evidence, (2) using impeachment evidence as substantive evidence, and (3) vouching for prosecution witnesses.  In his second claim, Petitioner alleges that he was denied a fair trial and due process of law by the testimony of police officers who were unqualified to give expert opinions on how drug dealers operate and whose opinions were not reliable because they did not satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Respondent argues that both these claims are procedurally defaulted.

### 1.  The Four Factors Comprising Procedural Default

A procedural default is "a critical failure to comply with state procedural law."  *Trest v. Cain*, 522 U.S. 87, 89 (1997).  The doctrine of procedural default prohibits a federal court from reviewing the merits of a habeas petitioner's claims, including constitutional claims, if the state court declined to hear the claims because the prisoner failed to abide by a state procedural rule.  *Martinez v. Ryan*, __ U.S. __, __, 132 S. Ct. 1309, 1316 (2012).  On habeas review, a prisoner may obtain relief on a procedurally-defaulted claim only if he or she "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

> [I]n the Sixth Circuit, "[a] habeas petitioner's claim will be deemed procedurally defaulted if each of the following four factors is met:  (1) the petitioner failed to comply with a state procedural rule; (2) the state courts enforced the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner has not shown cause and prejudice excusing the default."  [*Jalowiec v. Bradshaw*, 657 F.3d 293, 302 (6th Cir.

> 2011), *cert. denied*, __ U.S. __. 133 S. Ct. 107 (2012)]. To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look "to the last reasoned state court-decision disposing of the claim." *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010) (*en banc*).

*Henderson v. Palmer*, __ F.3d __, __,  No. 11-1943, 2013 WL 4838799, at *5 (6th Cir. Sept. 12, 2013).

The relevant state procedural rule in this case is the contemporaneous-objection rule, which requires defendants in criminal cases to preserve their claims for appeal by first making an objection in the trial court. *People v. Carines*, 597 N.W.2d 130, 137-39 (Mich. 1999). Petitioner violated this rule by failing to object at  trial to the prosecutor's alleged misconduct and to the police officers' expert testimony about how drug dealers operate. Thus, the first element of procedural default is satisfied.

The second element of procedural default (enforcement of a state procedural rule) also is satisfied. The Michigan Court of Appeals was the last state court to review Petitioner's claims on the merits, and it stated that Petitioner failed to properly preserve his arguments by challenging the prosecutor's conduct and expert testimony at trial. The Court of Appeals then reviewed Petitioner's unpreserved claims of error for "plain error affecting [Petitioner's] substantial rights." *Bell*, 2009 WL 1027462, at *1 and *4.

The third element (adequate and independent state ground) is satisfied as well.  As noted, the Michigan Court of Appeals reviewed Petitioner's claims for "plain error." Application of plain-error review constitutes enforcement of a contemporaneous-objection rule, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005), and "the contemporaneous-objection rule is an adequate and independent state ground barring federal habeas review." *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010), *cert. denied*,  __ U.S. __, 131 S. Ct. 1002 (2011).

To summarize, the first three elements of procedural default are satisfied. Petitioner violated an applicable state procedural rule, the last state court to review his claim in a reasoned opinion enforced the rule, and the state court's reliance on the rule was an adequate and independent state ground foreclosing review of the federal claim. Consequently, "federal habeas review of [Petitioner's] claims is barred unless [he] can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750.

### 2. Cause

Petitioner alleges that his trial attorney should have objected to the prosecutor's conduct and to the police officers' opinion testimony. "Ineffective assistance of counsel can constitute cause for a procedural default," *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013), but "[a]ttorney error short of ineffective assistance of counsel does not constitute cause for a procedural default . . . ." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). An attorney is constitutionally ineffective only if the attorney's "performance was deficient" and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The "deficient performance" prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*

The prejudice prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,'" but "[t]he likelihood of a different result must be

13

substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. at 792 (quoting *Strickland v. Washington*, 466 U.S. at 693). The Court will proceed to examine Petitioner's underlying claims to determine whether the alleged errors warranted an objection and whether the failure to object prejudiced Petitioner.

### a. The Co-Conspirators' Convictions

Petitioner alleges that the prosecutor improperly elicited testimony that Petitioner's two co-conspirators (Tracey Cowan and Rory Jones) had already been convicted for their role in the crimes for which Petitioner was on trial. This claim actually arose during defense counsel's cross-examination of Sergeant Kevin Cronin. Defense counsel asked Sergeant Cronin whether it was correct that Tracey Cowan, who was present during the raid at the house on Appoline Street, had been charged with items found at her house. Sergeant Cronin responded, "That is correct." Defense counsel then asked Sergeant Cronin whether he could recall the status of Ms. Cowan's case. Sergeant Cowan started to say, "She is currently serving . . . ." However, when the prosecutor objected to any testimony about the amount of time that Ms. Cowan was serving, Sergeant Cronin said, "She was found guilty." (Trial Tr. Vol. II, 457-58, Sept. 28, 2007.)

During re-direct examination of Sergeant Cronin, the prosecutor asked whether Rory Jones took responsibility for the items found at the Appoline Street house. Sergeant Cronin answered, "Yes." (*Id*. at 460-61.) And, during closing arguments, the prosecutor said:

> The defendant is charged in the first count with conspiracy to possess with the intent to deliver over 50 grams of cocaine, but less than 224 grams. . . . [H]e had an agreement with somebody, whether it be Rorry Jones or Tracey Cowan, or Joe Smith or Lisa Jones, he had an agreement with somebody that was inside the Appoline address, most likely, given by the facts that have been produced, Tracey Cowan, who has taken responsibility – well, she didn't take responsibility. She was found guilty for the items in the homes – and Rorry Jones, who took responsibility for the items in the home. He had an agreement with the person – those two people,

14

and/or maybe others known or unknown, as the Judge will indicate to you, to possess
with the intent to deliver over 50 grams of cocaine.

(*Id.* at 476.)  Neither Tracey Cowan, nor Rory Jones, testified at Petitioner's trial, and Petitioner claims that testimony about them could have caused the jury to abandon the presumption of innocence and conclude that Petitioner's guilt was settled and that the trial was a mere formality.

Because defense counsel asked about Tracey Cowan's status, the prosecutor cannot be blamed for eliciting Sergeant Cronin's testimony that Cowan was found guilty.  And even though the Michigan Court of Appeals determined that the prosecutor's elicitation of testimony about Rory Jones' conviction was improper, the Court of Appeals correctly noted that there was other evidence linking Jones to Petitioner and the Appoline residence:  Jones' vehicle was parked at the Appoline house when Petitioner entered the residence, and Petitioner's cellular telephone records established that he called Jones more than once when he went to the Appoline address, presumably, to get more cocaine.

Furthermore, Petitioner's trial counsel testified at the state evidentiary hearing that it was his and Petitioner's trial strategy to demonstrate that he had no dealings with the evidence at the house on Appoline Street.  To support this strategy, Petitioner wanted to show that Ms. Cowan had been found guilty of the drugs found at the house on Appoline Street and that Mr. Jones had taken responsibility for the drugs.  (Mot. Hr'g, 22, 39-40, Oct. 8, 2008.)  "In assessing deficient performance, reviewing courts must take care not to 'second guess' strategic decisions that failed to bear fruit." *Jackson v. Bradshaw*, 681 F.3d 753, 760 (6th Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. at 689), *cert. denied*, __ U.S. __, 133 S. Ct. 983 (2013).

As for the prosecutor's closing argument about Cowan and Jones, the argument was proper because it was tied to evidence that had already been introduced. *Wogenstahl v. Mitchell*, 668 F.3d

15

307, 331 (6th Cir.), *cert. denied sub nom Wogenstahl v. Robinson*, __ U.S. __, 133 S. Ct. 311 (2012). The trial court, moreover, instructed the jurors that the attorneys' arguments were not evidence. (Trial Tr. Vol. II, 514, Sept. 28, 2007.)   "[J]uries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), and a trial court generally can correct improprieties in a prosecutor's closing arguments by instructing the jury that closing arguments are not evidence. *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011) (citing *United States v. Emuegbunam,* 268 F.3d 377, 406 (6th Cir.2001)).

For all of the above reasons, the Court concludes that trial counsel's failure to object to the prosecutor's elicitation of testimony and her argument about the alleged co-conspirators' convictions did not amount to deficient performance.  Even if it did, there is not a substantial likelihood that the result of the trial would have been different, absent counsel's allegedly deficient performance. Therefore, trial counsel's performance did not prejudice the defense.

### b.  Impeachment Evidence as Substantive Evidence

Next, Petitioner alleges that the prosecutor improperly used impeachment evidence concerning Terrell Bell as substantive evidence.  Terrell testified on direct examination by the prosecutor that he did not know Petitioner was selling drugs.  (Trial Tr. Vol. II, 326, Sept. 28, 2007.) During the prosecutor's subsequent direct examination of deputy sheriff Brent Miles, the prosecutor asked Miles about his conversation with Terrell on the day after the raid at the house on Clarita Street.  According to deputy Miles, Terrell said that his brother (Petitioner) was the person selling the narcotics.  (*Id.* at 385-86.)  During closing arguments, the prosecutor commented that, "Terrell Bell said yes, my brother, was selling drugs."  (*Id.* at 511.)  She concluded her remarks by saying, "The only reason Terrell Bell said that Tamir Bell sold drugs is because he does."  (*Id.* at 512.)

16

Petitioner claims that the prosecutor's closing argument and her elicitation of Terrell's comment to Officer Miles amounted to improper use of a prior inconsistent statement as substantive evidence.

Defense counsel testified at the state evidentiary hearing that, although he knew Terrell's prior inconsistent statement could be used only to impeach Terrell, he did not consider asking for a limiting jury instruction. (Mot. Hr'g, 25-28, Oct. 8, 2008.) The Michigan Court of Appeals subsequently determined that the prosecutor properly elicited testimony about Terrell's prior inconsistent statement to the police, but that the prosecutor's closing argument – that the only reason Terrell said Petitioner sold drugs is because he does – was improper use of impeachment evidence as substantive evidence. The Court of Appeals nevertheless held that defense counsel's failure to object to the prosecutor's closing argument did not affect the outcome of the proceeding and, therefore, was not ineffective assistance.

This Court agrees with the state court's assessment of Petitioner's claim. There was substantial evidence, apart from Terrell's statement to deputy Miles, that Petitioner was involved in selling drugs, and the trial court instructed the jury that the attorneys' comments were not evidence. As previously explained, "juries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. at 211, and a trial court generally can correct improprieties in a prosecutor's closing arguments by instructing the jury that closing arguments are not evidence. *United States v. Crosgrove*, 637 F.3d at 664. Thus, even if trial counsel's failure to object to the prosecutor's argument amounted to deficient performance, there is not a reasonable probability that the deficient performance prejudiced the defense. It follows that trial counsel was not constitutionally ineffective for failing to object to the prosecutor's use of Terrell Bell's prior inconsistent statement as substantive evidence.

17

### c. Vouching

Petitioner claims that the prosecutor vouched for Shannon Portis, the informant who testified about his purchase of drugs from Petitioner during a controlled buy.  Although the prosecutor explicitly stated during her closing argument that she was *not* going to vouch for Mr. Portis' credibility at trial, she went on to say that Portis testified honestly at prior court proceedings in 2002 and in 2003.  She also said that the jury could accept Portis' prior testimony as true because it was given under oath and was corroborated by independent police investigation.  (Trial Tr. Vol. II, 472-75, Sept. 28, 2007.)  Petitioner maintains that the prosecutor's comments suggested that she had personal knowledge about Portis' truthfulness because she was the only person who knew the details of the prior court proceedings.

The Michigan Court of Appeals concluded on review of this claim that the prosecutor did not imply special knowledge and, therefore, did not engage in improper vouching.  A prosecutor engages in improper vouching when he or she

> supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [prosecutor] behind that witness." [*United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)].  This generally involves either blunt comments asserting personal belief, or comments that imply special knowledge of facts not before the jury or the credibility or truthfulness of the witness.  *Id.*

*United States v. Reid*, 625 F.3d 977, 982 (6th Cir. 2010).

The Court finds it unnecessary to decide whether the prosecutor's closing argument about Portis was improper vouching because, even assuming that it was, the other evidence in the case, particularly the police officers' testimony, was sufficient to establish Petitioner's guilt.  Therefore, defense counsel's allegedly deficient performance of failing to object to the prosecutor's argument about Portis did not prejudice the defense.

18

### d.  The Police Officers' Expert Opinions

Petitioner alleges that he was denied a fair trial and due process of law by the testimony of police officers who were either unqualified to give expert opinions on drug dealers or whose opinions did not satisfy the requirements of *Daubert*, 509 U.S. at 579.  Two of the police officers, Richard Wehby and David Emory Scott, were not qualified as experts, but they offered opinions about how drug dealers operate.  *See, e.g.,* Trial Tr. Vol. I, 139, 149, 152-53, 188, Sept. 27, 2007 (Officer Wehby's testimony about the packaging and shipping of cocaine, the use of scales in dealing with marijuana and cocaine, and an appropriate price for cocaine "between two friends"); *id* . at 290, 293-94, 297-98, Sept. 28, 2007 (Officer Scott's testimony about a hydraulic jack and other equipment, packaging materials, diluting agents, and the reason why proof of residency typically is not found where drugs are stored).  Petitioner claims that the testimony of these officers did not meet the requirements of *Daubert,* which requires expert testimony to be reliable before the prosecutor elicits it.

The third officer, Sergeant Kevin Cronin, was qualified as an expert in drug trafficking and then testified about how powder cocaine is compressed into rock form and wrapped with cellophane. He also testified about the tiered system of drug dealers and the similarity of the pressed cocaine found in the garage at the house on Clarita Street and the cocaine found at the house on Appoline Street.  (Trial Tr. Vol. II, 428, 430-32, Sept. 28, 2007.)  Petitioner claims that this was error because there was no showing that Sergeant Cronin employed a scientifically reliable technique when forming his opinion.

The Michigan Court of Appeals determined that the trial court did not abuse its discretion, nor commit plain error, when it qualified Sergeant Cronin as an expert in narcotics trafficking and

19

allowed Cronin to give expert testimony.  The Court of Appeals opined that defense counsel's failure to object to Cronin being qualified as an expert witness would have been futile.  The Court of Appeals also determined that the trial court did not err or abuse its discretion by allowing Officers Wehby and Scott to provide basic opinion testimony stemming from evidence that they personally observed.

In *Daubert*, the Supreme Court stated that trial judges "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 689.  The Sixth Circuit has "applied this standard specifically to law enforcement agents testifying as experts on drug trafficking" and has consistently found such testimony "to be relevant, noting that '[c]ourts have overwhelmingly found police officers' expert testimony admissible where it will aid the jury's understanding of an area, such as drug dealing, not within the experience of the average juror.'" *United States v. Lopez-Medina*, 461 F.3d 724, 742 (6th Cir. 2006) (citations omitted).

The record, moreover, indicates that the officers' testimony was reliable.  Officer Wehby testified that he received basic academy training in narcotics enforcement with in-service training twice a year for six years.  He also received training from the Drug Enforcement Agency, the Detroit Police Department, several departments in Florida, and other agencies.  (Trial Tr. Vol. I, 120, Sept. 27, 2007.)

Sergeant Cronin received similar training.  In addition, he had utilized informants in the past, had participated in the execution of approximately 400 search warrants, and had purchased cocaine as an undercover officer.  He also was involved in hundreds of incidents where drugs were purchased.  (Trial Tr. Vol. II, 418-19, Sept. 28, 2007.)

Officer Scott testified that he was a member of the Oakland County Narcotics Enforcement

Team for two years.  (Trial Tr. Vol. I, 282-83, Sept. 27, 2007.)  Although he did not testify about any specialized training in narcotics enforcement, it is clear from his testimony that he was knowledgeable about trafficking in narcotics.

All three officers obviously were experienced in, and had specialized knowledge about, illegal drug operations.  The trial court, moreover, instructed the jurors that they did not have to believe an expert's opinion and that the testimony of police officers was to be judged by the same standards that are used to evaluate the testimony of other witnesses.  (Trial Tr. Vol. II, 520, Sept. 28, 2007.)  Give these instructions and the officers' obvious qualifications, defense counsel's failure to object to the officers' opinions did not amount to deficient performance.

The Court concludes for all the reasons given above that trial counsel was not constitutionally ineffective for failing to object to the prosecutor's conduct or to the police officers' opinions on drug dealers and narcotics trafficking.  Therefore, Petitioner has failed to establish "cause" for his procedural defaults.

### 3.  Prejudice, Miscarriage of Justice

Because Petitioner has not established "cause" for his procedural defaults, the Court is not required to determine whether he was prejudiced by the alleged constitutional violations.  *Tolliver v. Sheets*, 594 F.3d 900, 930 n.13 (6th Cir. 2010).  The remaining issue is whether a miscarriage of justice will occur as a result of the Court's failure to review Petitioner's first and second claims on the merits.

The miscarriage-of-justice exception "is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera v. Collins*, 506 U.S. 390, 404 (1993).  "[I]n an extraordinary case, where a constitutional

21

violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Murray v. Carrier*, 477 U.S. at 496.

To be credible, however, a claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). The petitioner's burden "is to demonstrate that more likely than not, in light of the new evidence . . . any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006).

Petitioner has not presented the Court with any new evidence in support of a claim of actual innocence, and the evidence against him was substantial. Consequently, a miscarriage of justice will not occur as a result of the Court's failure to adjudicate the substantive merits of Petitioner's claims. The first and second habeas claims are procedurally defaulted and barred from substantive review.

## B.  The Sufficiency of the Evidence

The third habeas claim alleges that the evidence at trial was insufficient to support Petitioner's felony firearm convictions. Petitioner claims that he was not in physical proximity to any firearms and that no witness testified to seeing him possess a firearm during the commission of a crime. Although guns were found in the house on Appoline Street and in the garage behind the house on Clarita Street, Petitioner maintains there was no testimony that he was present when the guns were found or when the drug crimes were committed. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits and concluded "that a rational trier of fact could have found beyond a reasonable doubt that the elements of felony-firearm were met." *Bell*, 2009 WL

22

1027462, at *8.

### 1.  Clearly Established Federal Law

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  After *Winship*, the critical inquiry on habeas review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original).

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204–05 (6th Cir. 2009)), *cert. denied*, __ U.S. __, 131 S. Ct. 2103 (2011).  First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, *any rational trier of fact* could have found the essential elements of the crime beyond a reasonable doubt." *Brown v. Konteh*, 567 F.3d at 205 (citing *Jackson v. Virginia*, 443 U.S. at 319) (emphasis in original).  Second, even if the Court were "to conclude that a rational trier of fact could *not* have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the *state appellate court's* sufficiency determination as long as it is not unreasonable." *Id.*

(emphases in original).

## 2. Application

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson v. Virginia*, 443 U.S. at 324 n.16. In Michigan,

> "[t]he elements of felony-firearm are that the defendant possessed a firearm during the commission of, or the attempt to commit, a felony." One must carry or possess the firearm when committing or attempting to commit a felony. Possession of a firearm can be actual or constructive, joint or exclusive. "[A] person has constructive possession if there is proximity to the article together with indicia of control. Put another way, a defendant has constructive possession of a firearm if the location of the weapon is known and it is reasonably accessible to the defendant." Possession can be proved by circumstantial or direct evidence and is a factual question for the trier of fact.

*People v. Johnson*, 808 N.W.2d 815, 818 (Mich. Ct. App. 2011) (footnotes omitted).

The testimony at trial established that Petitioner stored his cocaine at the house on Clarita Street and perhaps even lived there part-time. One policeman observed Petitioner enter and exit the detached garage on Clarita Street and then approach Shannon Portis' vehicle. Portis subsequently met with the officers who had been monitoring him and gave them the cocaine that Petitioner had sold to him.

In a subsequent search of the detached garage on Clarita Street, the police found a shotgun covered by a blanket and leaning against the garage wall. In a box above the rafters there was a handgun with two prescription bottles. Although the pill bottles had Terrell Bell's name on them, there was evidence that Petitioner used Terrell's name to acquire the prescriptions. Next to the shoe box with the pill bottles and handgun, there was another shoe box with cocaine in it.

A rational trier of fact could have concluded that Petitioner had proximity to the firearms in

the garage, was aware of them, and had control over them while he was committing a felony.  Thus, there was sufficient evidence that Petitioner constructively possessed the firearms on Clarita Street while committing the crimes of conspiracy to possess with intent to deliver cocaine and possession with intent to deliver cocaine.  Even if a rational trier of fact could not have found Petitioner guilty of felony firearm beyond a reasonable doubt, the state appellate court's determination that the evidence was sufficient was not unreasonable, and the Court must defer to that determination. Petitioner therefore has no right to relief on his sufficiency-of-the-evidence claim.

**C.  Trial Counsel**

In his fourth and final claim, Petitioner alleges that he was denied a fair trial by his trial attorney's ineffective assistance.  Specifically, Petitioner claims that trial counsel unreasonably failed to object to the prosecutor's conduct and to the admission of expert witness testimony.

The Michigan Court of Appeals determined that trial counsel should not have elicited evidence of Tracey Cowan's convictions.  The Court of Appeals also opined that trial counsel should have challenged the prosecutor's closing argument about Ms. Cowan and Rory Jones, the prosecutor's attempts to elicit testimony regarding Jones' conviction, and the prosecutor's argument that "[t]he only reason Terrell Bell said that Tamir Bell sold drugs is because he does."  The Court of Appeals nevertheless concluded that trial counsel's actions and inactions furthered his trial strategy and did not amount to ineffective assistance.

This Court finds, for the reasons given above in the Court's procedural default analysis, that trial counsel's acts and omissions either did not amount to deficient performance or did not prejudice the defense.  Therefore, Petitioner has failed to establish an independent claim of ineffective assistance of counsel.  The Court declines to grant relief on Petitioner's fourth claim.

25

## IV.  CONCLUSION

Petitioner's first two claims are procedurally defaulted, and the state appellate court's decision on Petitioner's third and fourth claims was not contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. Accordingly, the petition for a writ of habeas corpus [dkt 1] is denied.

## V.  CERTIFICATE OF APPEALABILITY

Before Petitioner may appeal this decision, a certificate of appealability must issue.  28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b)(1).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. . . .  When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. at 484.

Reasonable jurists would not find the Court's assessment of Petitioner's third and fourth claims debatable or wrong.  As for Petitioner's first and second issues, Petitioner has not stated a valid claim of the denial of a constitutional right, nor shown that reasonable jurists would find it

26

debatable whether the Court was correct in its procedural ruling.  The Court therefore declines to issue a certificate of appealability.

S/Lawrence P. Zatkoff
HON. LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:   October 31, 2013